[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEP 07, 2011
JOHN LEY
CLERK

No. 10-15646
Non-Argument Calendar
_____

D.C. Docket No. 1:09-cr-00188-MEF-WC-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

STEVEN MICHAEL CAPSHAW,
a.k.a. Mike Capshaw,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Alabama

_____

(September 7, 2011)

Before HULL, MARTIN and ANDERSON, Circuit Judges.

PER CURIAM:

After a jury trial, Defendant Steven Michael Capshaw appeals his conviction and 120-month sentence for one count of using or causing the use of a facility of interstate or foreign commerce (a telephone), with intent to commit murder-for-hire, in violation of 18 U.S.C. § 1958. On appeal, Capshaw argues that: (1) the government did not present sufficient evidence that, independent of government intervention, he used a telephone in the commission of the offense; (2) to the extent the government established that he used a telephone, that jurisdictional element was manufactured by the government; and (3) at sentencing, his offense level should not have been increased for obstruction of justice based on his trial testimony. After review, we affirm.

## I. BACKGROUND

Because Defendant Capshaw's trial issues revolve around the sufficiency of the government's evidence of his use of the telephone to commit the offense, we first review the pertinent trial evidence in the light most favorable to the government. See United States v. Byrd, 403 F.3d 1278, 1288 (11th Cir. 2005) (explaining that, in reviewing the denial of a motion for a judgment of acquittal, "we view the evidence in the light most favorable to the government, with all reasonable inferences and credibility choices drawn in the government's favor").

### A. Trial Evidence

2

In August 2009, Defendant Capshaw's wife, Sandra Capshaw ("Sandra"), told him that she wanted a divorce and then moved out of the family home into an apartment. Although Capshaw had very infrequent contact with his sister, Karen Whitaker, Capshaw called Karen in early October 2009 and asked to meet her at the Farm Center. Karen then called her daughter (and Capshaw's niece), Nathina Whitaker, and asked her to be at the Farm Center meeting too.

At the meeting, Defendant Capshaw told his sister Karen that he and his wife Sandra were getting a divorce and that he wanted his wife taken out of the picture. At some point, Karen's daughter, Nathina, arrived. Karen explained to Nathina that Defendant Capshaw wanted to kill his wife and asked Nathina whether she knew anyone who would do it, or if she would be willing to do it herself.

There is conflicting evidence as to whether Nathina agreed to participate in the plot. Nathina testified that: (1) she told her mother and Capshaw they were crazy; (2) she left, and afterward, Capshaw tried to contact her numerous times by phone; and (3) Nathina did not return his calls. However, there is also evidence in the record that Nathina accepted $2500 from Capshaw.

Meanwhile, on October 28, 2009, police, acting on a tip, contacted Nathina and interviewed her about a possible murder-for-hire plot. Nathina agreed to

cooperate with their investigation. The next morning, while investigators conducted video and audio surveillance, Nathina went to her mother Karen's house to talk about Capshaw's wanting to kill his wife. Karen told Nathina to call Capshaw.

That afternoon, with investigators recording, Nathina called Defendant Capshaw on a cell phone and told him she had "somebody that can do that for you." Capshaw suggested they meet at Lowe's, where Capshaw was working. After the call ended, Nathina's boyfriend, Tate O'Neal, volunteered to pose as the "hitman" and go with Nathina to Lowe's.

Nathina and O'Neal were wired with video and audio recording devices and, while under police surveillance, went to Lowe's and met with Defendant Capshaw. O'Neal and Capshaw discussed Sandra's apartment and possible payment. Capshaw agreed to call O'Neal after he got off work to arrange a second meeting to show O'Neal the area around Sandra's apartment.

Later that evening, Defendant Capshaw called O'Neal at the cell phone number Nathina had used to call Capshaw earlier. Capshaw told O'Neal he was ready to meet. O'Neal stalled Capshaw until he could report to investigators, at which point O'Neal returned Capshaw's call in the presence of law enforcement

4

and while the call was recorded. Capshaw and O'Neal arranged to meet at Nurse-Temps, another place where Capshaw worked.

O'Neal and his car were equipped with video and audio recorders. Then, O'Neal drove to Nurse-Temps and picked up Capshaw. Following Capshaw's directions, O'Neal drove to Sandra's apartment complex. Capshaw pointed out Sandra's apartment, a secluded place for O'Neal to park his car, routes for an easy getaway and a nearby motel where O'Neal could go to clean up after the murder. Capshaw gave O'Neal Sandra's work schedule and said he did not care how O'Neal killed Sandra as long as she was dead. When O'Neal suggested using a gun with a silencer, Capshaw suggested using a knife or machete, which would be quieter. When they drove back to Capshaw's car, Capshaw gave O'Neal a knife and a box of latex gloves.

Defendant Capshaw testified in his own defense and denied that he was involved in a plot to kill his wife. According to Capshaw, Nathina threatened to harm Capshaw and his son unless Capshaw paid her for killing Sandra. Capshaw admitted giving Nathina money on multiple occasions to ensure that nothing happened and claimed his meetings with Nathina and O'Neal were to gather enough information to go to the police. Capshaw contended he gave O'Neal the knife and gloves "to get something in [O'Neal's] vehicle" so the police would

5

know Capshaw was telling the truth. Defendant Capshaw claimed he was on his way to the police to report the plot when he was arrested.

**B.     Capshaw's Motions for a Judgment of Acquittal**

Defendant Capshaw moved for a judgment of acquittal after the government rested its case and again after the close of evidence. Capshaw argued that the government failed to present evidence that between October 1 and 29, 2009, Capshaw had used the telephone with the intent to commit murder because the substance of the phone calls was either not related to the plot, or related to Capshaw's attempts to thwart the plot. Capshaw argued that any use of the telephones between October 29 and 30 was at the direction of the government. The district court denied Capshaw's motions. The jury convicted Capshaw of violating 18 U.S.C. § 1958.

After conviction, Capshaw filed another motion for judgment of acquittal or, in the alternative, a motion for new trial, arguing, inter alia, that the government had not presented sufficient evidence that Capshaw had "used a facility of interstate commerce while it had some nexus to interstate commerce," and that even if it had, the government had "manufactured jurisdiction" by using a government informant to make phone calls to facilitate the plot. Capshaw also filed a motion to dismiss for lack of jurisdiction under Federal Rule of Criminal

Procedure 12(b)(3)(B). The district court denied these motions and Capshaw's subsequent motion for reconsideration.

**D.    Sentencing**

The presentence investigation report ("PSI") recommended a base offense level of 37, pursuant to U.S.S.G. § 2A1.5(a), and a 2-level enhancement for obstruction of justice, pursuant to U.S.S.G. § 3C1.1, because Capshaw committed perjury during his trial. With a total offense level of 39 and a criminal history category of I, the resulting advisory guidelines range was 262 to 327 months' imprisonment. However, because the statutory maximum sentence under 18 U.S.C. § 1958 is 120 months, Capshaw's advisory guidelines range became 120 months. See U.S.S.G. § 5G1.1(a).

Capshaw objected to the obstruction of justice enhancement and the PSI's statement that he committed perjury. The district court overruled Capshaw's objection and determined that the 2-point enhancement under U.S.S.G. § 3C1.1 was proper, stating:

> To believe that you were operating in an effort to assist law enforcement in arresting individuals or an individual who was going to do harm to your estranged wife, I would have expected to hear testimony that you had done something to document your efforts so that you could turn that over to law enforcement to support your version of these facts. I heard no such testimony. I heard no evidence that you had done anything to even document that you had a conversation with the person who was

hired. I also didn't hear any testimony that you had done anything which would have left the commission of the act in limbo until you could have gone to law enforcement, contacted them, and arranged for some type of stakeout and then done the final act, such as pay the money or make the phone call or do whatever you were going to – a person would have done under those circumstances to put in motion the final version of this crime.

The district court adopted the PSI's factual statements and guidelines calculations, determined that Capshaw's guidelines range was 120 months and sentenced Capshaw to 120 months' imprisonment. Capshaw filed this appeal.

## II. DISCUSSION

### A.     Sufficiency of the Evidence of Interstate Nexus

Defendant Capshaw argues that the district court erred in denying his motions for a judgment of acquittal because the government did not meet its burden to show the interstate commerce jurisdictional element of 18 U.S.C. § 1958.[1]

Section 1958 of Title 18 provides in pertinent part:

Whoever . . . uses or causes another (including the intended victim) to use . . . any facility of interstate or foreign commerce, with intent that a murder be committed in violation of the laws of any State or the United States as consideration for the receipt of, or as consideration for a

---

[1]"We review a district court's denial of a motion for judgment of acquittal based on sufficiency of the evidence <u>de novo</u>." <u>United States v. Smith</u>, 459 F.3d 1276, 1286 (11th Cir. 2006). We likewise "review <u>de novo</u> the district court's interpretation and application of the statutory provisions concerning the court's subject matter jurisdiction." <u>United States v. Evans</u>, 476 F.3d 1176, 1178 (11th Cir. 2007) (quotation marks omitted).

promise or agreement to pay, anything of pecuniary value, or who conspires to do so, shall be fined under this title or imprisoned for not more than ten years, or both . . . .

18 U.S.C. § 1958(a).  Section 1958(b) provides that "'facility of interstate or foreign commerce' includes means of transportation and communication."  18 U.S.C. § 1958(b).  "The telephone system is clearly a 'facility of interstate . . . commerce,'" and "[a]nswering a telephone and conversing on it" constitutes use of a facility of interstate commerce.  United States v. Covington, 565 F.3d 1336, 1343 (11th Cir.) (alteration in original) (quoting 18 U.S.C. § 1958(b)), cert. denied, 130 S. Ct. 564 (2009).

The current language in § 1958 "establishes federal jurisdiction whenever any 'facility of interstate commerce' is used in the commission of a murder-for-hire offense, regardless of whether the use is interstate in nature (i.e. the telephone call was between states) or purely intrastate in nature (i.e. the telephone call was made to another telephone within the same state)."  United States v. Drury, 396 F.3d 1303, 1311 (11th Cir. 2005).[2]  Reviewing another criminal statute with a

_____

[2]Defendant Capshaw argues that the Drury Court declined to hold whether § 1958(a) actually requires that a facility be used in interstate commerce.  However, Drury addressed the former version of § 1958(a), which prohibited the "use [of] mail or any facility in interstate or foreign commerce, with intent that a murder be committed."  See 18 U.S.C. § 1958(a) (2000) (emphasis added).  We commented in Drury that Congress had since amended the statute to read "facility of interstate commerce," confirming that a purely intrastate use of a phone satisfies the jurisdictional element of the statute.  396 F.3d at 1311.

similar jurisdictional element, this Court has concluded that the use of a telephone constitutes the use of "instrumentalities of interstate commerce" regardless of whether the call is routed across state lines. See United States v. Faris, 583 F.3d 756, 759 (11th Cir. 2009) (quotation marks omitted) (holding that 18 U.S.C. § 2422(b), as applied to defendant, did not exceed Congress's commerce power because "[e]ven if none of Faris' communications were routed over state lines, the internet and telephone he used to contact the undercover officer were still 'instrumentalities of interstate commerce'"); United States v. Evans, 476 F.3d 1176, 1180-81 (11th Cir. 2007) (holding that defendant's use of telephones and cell phones alone, even without evidence that the calls were routed through an interstate system, was sufficient to satisfy 18 U.S.C. § 2422(b)'s jurisdictional element).

Moreover, the government presented sufficient evidence for a jury to reasonably find that Defendant Capshaw used the telephone to further the murder-for-hire plot. Specifically, (1) Capshaw called his sister in early October and set up a meeting with her at which he discussed finding someone to kill his wife; (2) Capshaw received a call from Nathina and arranged to meet her at Lowe's to meet O'Neal, the purported "hitman"; (3) Capshaw called O'Neal to set up a second meeting to give O'Neal details he would need to commit the murder; and (4)

Capshaw received a call back from O'Neal to finalize the arrangements for the second meeting. The district court did not err in denying Capshaw's motion for judgment of acquittal on the basis of the evidence presented to satisfy the jurisdictional element of 18 U.S.C. § 1958.

**B.  "Manufactured Jurisdiction"**

Alternatively, Defendant Capshaw argues that any evidence establishing interstate commerce jurisdiction was "manufactured by the government," in that all of the phone calls involving the murder plot were made to Capshaw by government agents at the direction of law enforcement, and Capshaw's sole phone call to O'Neal in furtherance of the plot was instigated by government action.

Capshaw relies on United States v. Coates, 949 F.2d 104 (4th Cir. 1991) (holding no jurisdiction under 18 U.S.C. § 1958 where a government agent traveled across state lines to place a call to defendant solely to establish federal jurisdiction), and United States v. Archer, 486 F.2d 670, 681-83 (2d Cir. 1973) (dismissing an indictment under the Travel Act because the telephone calls involved were "manufactured by the Government for the precise purpose of transforming a local . . . offense into a federal crime"). But see United States v. Petit, 841 F.2d 1546, 1553-54 (11th Cir. 1988) (expressing "doubt" about Archer's proscription against the "manufacture" of federal jurisdiction "in circumstances

11

not constituting entrapment and not canceling any element of the crime such as criminal intent" (quotation marks omitted)). We need not decide whether the government's investigative conduct may be so outrageous as to bar the government from invoking judicial processes because here the government's investigative conduct does not rise to such a level and thus federal jurisdiction is proper. See id. (concluding that federal jurisdiction was proper where FBI had used goods in interstate commerce in sting operation); Covington, 565 F.3d at 1343-44 (rejecting defendant's reliance on Coates where "[t]he FBI did not contrive to make the phone calls in order to manufacture the interstate element as was the case in Coates, but only collected more and better evidence of the crime").

Jurisdiction in this case was not based on a single phone call initiated by the police solely to establish jurisdiction, as it was in Coates. Nor did the investigators in this case employ cellular phones solely to manufacture jurisdiction; they merely used them as a tool in their investigation of Capshaw. Moreover, there was sufficient trial evidence in the form of telephone records and the testimony from Karen and Nathina Whitaker to support the finding that Defendant Capshaw had called Karen and Nathina in furtherance of the plot in early October of 2009, before the investigation even began. Under these particular

factual circumstances, the district court did not err in concluding that jurisdiction was proper under 18 U.S.C. § 1958.

## C.   Obstruction of Justice Enhancement

Defendant Capshaw argues that his sentence is procedurally unreasonable because the district court erred in applying a 2-level obstruction of justice enhancement under U.S.S.G. § 3C1.1.[3]

Section 3C1.1 provides for a 2-level increase in the offense level if the defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction" and "the obstructive conduct related to . . . the defendant's offense of conviction and any relevant conduct." U.S.S.G. § 3C1.1. The § 3C1.1 enhancement applies if a defendant commits perjury pertaining to conduct that forms the basis of the offense of conviction or provides materially false information to a judge or magistrate. U.S.S.G. § 3C1.1 cmt. n.4(B), (F). For purposes of applying this enhancement, perjury is defined as "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory."

---

[3]Capshaw makes no argument as to the substantive reasonableness of his sentence.

United States v. Bradberry, 466 F.3d 1249, 1254 (11th Cir. 2006) (quotation marks omitted).[4]

We cannot say that the district court clearly erred in applying the obstruction of justice enhancement. The district court made a sufficient independent factual determination that Capshaw lied during his testimony based on the inconsistencies in his testimony. Capshaw's testimony directly contradicted the testimony of other witnesses and was irreconcilable with the evidence presented by the government. Capshaw's assertion that he was an unwilling participant in the murder plot was undermined by his own admission that he failed to approach the police with any information about the crime.

Furthermore, even without the 2-level obstruction of justice enhancement, Capshaw's guidelines range would have been 210 to 262 months, well above the statutory maximum of 120 months under 18 U.S.C. § 1958. Under such circumstances, the guidelines range becomes the statutory maximum sentence. See U.S.S.G. § 5G1.1(a) (providing that where the statutory maximum sentence is less than the low end of the applicable guidelines range, the statutory maximum

---

[4]When a district court imposes an enhancement for obstruction of justice, we review the district court's factual findings for clear error and its application of the Sentencing Guidelines to those facts de novo. United States v. Massey, 443 F.3d 814, 818 (11th Cir. 2006). Where the district court bases an obstruction of justice enhancement on perjury, we "accord great deference to the district court's credibility determinations." United States v. Singh, 291 F.3d 756, 763 (11th Cir. 2002) (quotation marks omitted).

sentence "shall be the guideline sentence"). In other words, even if the district court had sustained Capshaw's objection to the enhancement, Capshaw's guidelines sentence would have remained 120 months. Thus, any error in the district court's application of an obstruction of justice enhancement was harmless. See United States v. Jones, 1 F.3d 1167, 1171 (11th Cir. 1993) ("A sentencing error is harmless if the record as a whole shows that the error did not affect the district court's selection of the sentence imposed.").

**AFFIRMED.**